A08A2106. GEORGIA POWER COMPANY v. GEORGIA PUBLIC SERVICE COMMISSION et al.

(675 SE2d 294)

JOHNSON, Presiding Judge.

This appeal involves a dispute over electrical service for two office buildings near Leesburg, Georgia. In 2002, Georgia Power Company learned that Sumter Electric Membership Corporation intended, at the request of the building owners, to provide electricity to the buildings. Asserting that it was "the lawful supplier of

---

[15] *O'Neal v. Home Town Bank of Villa Rica,* 237 Ga. App. 325, 332 (8) (514 SE2d 669) (1999).

[16] Id.

[17] Id. (punctuation and footnote omitted).

[18] See id.; *South River Farms v. Bearden,* 210 Ga. App. 156, 158 (435 SE2d 516) (1993).

electricity to the premises" under the Georgia Territorial Electric Service Act ("the Territorial Act"),[1] Georgia Power petitioned the Public Service Commission ("PSC") to stop Sumter's effort. The PSC rejected Georgia Power's claim, and the trial court affirmed the agency determination. For reasons that follow, we reverse.

The underlying facts are not in dispute. In 1973, the General Assembly enacted the Territorial Act for the express purpose of establishing and implementing "a plan whereby every geographic area within the state shall be either assigned to an electric supplier or declared unassigned as to any electric supplier."[2] The Act provided a mechanism for assigning the territories and authorized the PSC to make the assignments pursuant to specific statutory criteria.[3]

Georgia Power has been the electrical supplier in the area around Leesburg since 1975, when the PSC assigned the territory to it. The office buildings at issue here are located in Georgia Power's service area and lie within 500 feet of an electrical transmission line that is also found within the service area. Although Georgia Power owned that transmission line in 1975, it sold the line to Oglethorpe Power Corporation in 1982.

At that time, Oglethorpe was owned by 39 electric membership corporations ("EMCs"), including Sumter, and serviced the EMCs' power generation and transmission needs. In 1997, the EMCs restructured Oglethorpe into separate generation, transmission, and system operation companies and formed the Georgia Transmission Corporation ("GTC") to perform transmission functions. Oglethorpe transferred its interest in the transmission line at issue here to GTC, which held title during the relevant period. The parties stipulated below that "[a]s an owner of GTC, Sumter . . . has a proprietary and possessory interest in the Line."

When Sumter sought to provide electricity to the two office buildings near Leesburg, Georgia Power objected, arguing that it had the exclusive right to serve consumers in the area. In response, Sumter asserted that it had a "corridor right" to service the buildings based on its ownership interest in the nearby transmission line. A hearing officer agreed with Sumter and recommended that the PSC deem Sumter the lawful supplier of electricity to the office buildings. Georgia Power excepted to the hearing officer's findings, but the PSC adopted the recommended decision. The superior court affirmed the PSC's ruling, and this appeal followed.

---

[1] OCGA § 46-3-1 et seq.

[2] OCGA § 46-3-2.

[3] See OCGA § 46-3-4.

1. Before reaching the merits of Georgia Power's appeal, we must address a procedural issue. Under OCGA § 50-13-19 (g), a trial court reviewing an administrative agency decision *shall*, upon request, hear oral argument and receive written briefs. Georgia Power asserts — and the PSC concedes — that the trial court failed to do so here, despite Georgia Power's specific request. Given this failure, the PSC argues that we must remand to the trial court for further proceedings consistent with OCGA § 50-13-19 (g). Both Georgia Power and Sumter, on the other hand, urge us to consider the merits of this appeal "[i]n the interest of judicial economy."

Although we certainly could remand,[4] the statutory language does not demand this result. A superior court must receive briefs and/or hold a hearing in an administrative appeal only "upon request."[5] Georgia Power thus could have waived its opportunity for briefing and a hearing at the trial court level. We recognize that it did not do so. But by asking us to consider the merits of this appeal, Georgia Power has essentially withdrawn or abandoned its briefing and hearing request. We see no reason why we should not honor the withdrawal and address the appeal, particularly since the parties have now fully briefed the issues.[6]

2. The crux of this dispute revolves around the proper interpretation of OCGA § 46-3-4, the Territorial Act provision that established procedures for geographic assignments to electricity suppliers. Beginning in March 1973, the PSC assigned territories to specific suppliers based on public convenience and necessity.[7] The General Assembly intended that the selected supplier own "all or a preponderance of the lines" in the assigned area.[8] It recognized, however, that a small number of lines in an assigned area might be owned by other suppliers. It thus set forth guidelines for determining the service rights — or "corridor rights" — of a supplier owning a line within a territory assigned to a competitor. Under OCGA § 46-3-4 (4):

> [F]rom and after the date of the assignment to an electric supplier of the geographic area within which such line is enclosed and based upon the location of both suppliers' lines

---

[4] See *Bd. of Regents v. Cohen*, 197 Ga. App. 463, 464 (398 SE2d 758) (1990).

[5] OCGA § 50-13-19 (g); see also *Bd. of Regents v. Moore*, 210 Ga. App. 623, 626 (2) (436 SE2d 789) (1993) ("Although petitioners for judicial review of an administrative decision have the right to file briefs if they wish to do so under OCGA § 50-13-19 (g), briefs are not required for superior court review of such decisions as a general matter.").

[6] Compare *Cohen*, supra (no indication that appellant withdrew its request to file briefs and have a hearing under OCGA § 50-13-19 (g)).

[7] OCGA § 46-3-4 (2).

[8] OCGA § 46-3-4 (3).

on that date, the electric supplier owning such enclosed line shall have the exclusive right to extend and continue furnishing service to all new premises locating at least partially within 500 feet of such line and wholly more than 500 feet from the assignee electric suppliers' lines and shall have the right, if chosen by the consumer utilizing such premises, to extend and continue furnishing service to new premises locating at least partially within 500 feet of both electric suppliers' lines.

Applying this provision, the PSC found that Sumter's transmission line fell within Georgia Power's territory, but that it was within 500 feet of the office buildings at issue, the buildings were over 500 feet from a Georgia Power line, and the office building consumers had chosen Sumter as their provider. The PSC thus concluded that corridor rights arose, giving Sumter the exclusive right to furnish electricity to the buildings.

Georgia Power challenges this ruling on appeal, asserting that the PSC fundamentally misinterpreted OCGA § 46-3-4 (4). It argues that corridor rights in the Leesburg area attached as of the date the PSC originally assigned the territory in 1975. According to Georgia Power, only electric suppliers that owned lines in the area *on the date of assignment* may assert corridor rights under OCGA § 46-3-4 (4). It thus claims that Sumter, which first obtained an interest in the transmission line in 1982, has no corridor rights within the territory. We agree.

"The cardinal rule of statutory construction is first, to ascertain the legislative intent and purpose in enacting the law and then to give it that construction which will effectuate the legislative intent and purpose."[9] In this case, we must determine when the General Assembly intended for corridor rights to arise. And although we generally defer to the PSC's interpretation of the Territorial Act,[10] that deference is not absolute. As our Supreme Court recently explained:

It is the role of the judicial branch to interpret the statutes enacted by the legislative branch and enforced by the executive branch, and administrative rulings will be

---

[9] (Citation and punctuation omitted.) *Sawnee Elec. Membership Corp. v. Ga. Public Svc. Comm.*, 273 Ga. 702, 704 (544 SE2d 158) (2001).

[10] See *City of LaGrange v. Ga. Power Co.*, 185 Ga. App. 60, 63 (363 SE2d 286) (1987) ("[T]he PSC, as the agency charged with oversight and supervision of electric power companies in this State, [cit.], including the enforcement and administration of the [Territorial Act], is entitled to great deference in its interpretation of the Act.").

adopted only when they conform to the meaning which the court deems should properly be given. The judicial branch makes an independent determination as to whether the interpretation of the administrative agency correctly reflects the plain language of the statute and comports with the legislative intent.[11]

Viewed in isolation, OCGA § 46-3-4 (4) does not clearly establish when corridor rights arise. Prefatory language in the statute, however, sheds light on the issue. The statute's introduction provides:

> After March 29, 1973, and continuing thereafter as rapidly as it is administratively practicable to do so, the [PSC] is authorized and directed to assign to electric suppliers or to declare as unassigned . . . all geographic areas in this state that were, on March 29, 1973, located outside the corporate limits of any municipality. Such assignments and declarations of unassignment shall be effected by the [PSC] in accordance with the following standards. . . .[12]

The statute then lists six standards for assigning territorial rights, including the corridor rights criteria in OCGA § 46-3-4 (4).

Reading the statute as a whole,[13] we find that the legislature intended OCGA § 46-3-4 to establish a procedure for the initial assignment of geographic territories to electrical suppliers. These assignments were to occur "as rapidly as possible" after March 1973,[14] and with respect to the Leesburg area, the assignment took place in 1975. Nothing in the prefatory language expanded the reach of OCGA § 46-3-4 beyond the territorial assignment date, and the corridor rights provision does not compel such an expansion. Simply put, the statute established a method for assigning an electrical service territory and, within that framework, provided corridor-right protection for non-assigned suppliers who owned lines in the area on the assignment date.[15]

Given the purpose of OCGA § 46-3-4, Sumter cannot establish

---

[11] (Citations and punctuation omitted.) *Handel v. Powell*, 284 Ga. 550, 553 (670 SE2d 62) (2008).

[12] OCGA § 46-3-4.

[13] See *Ins. Dept. of the State of Ga. v. St. Paul &c. Ins. Co.*, 253 Ga. App. 551, 552 (559 SE2d 754) (2002) ("Language in one part of the statute must be interpreted in light of the legislature's intent as found in the whole statute.").

[14] OCGA § 46-3-4.

[15] See *City of Calhoun v. North Ga. Elec. Membership Corp.*, 233 Ga. 759, 767 (5) (a) (213 SE2d 596) (1975).

YALE LAW LIBRARY

corridor rights based on a transmission line acquired seven years after the territorial assignment. To find otherwise would improperly expand OCGA § 46-3-4 and pervert the legislature's intent. Accordingly, the trial court erred in affirming the PSC's decision, which misinterpreted OCGA § 46-3-4 (4) and misapplied the law.[16]

*Judgment reversed. Barnes and Phipps, JJ., concur.*

DECIDED MARCH 11, 2009 — ▮▮▮▮▮▮

*Troutman Sanders, Robert P. Edwards, Jr.*, for appellant.

*Thurbert E. Baker, Attorney General, Isaac Byrd, Deputy Attorney General, Sidney R. Barrett, Jr., Senior Assistant Attorney General, Daniel S. Walsh, Alex F. Sponseller, Assistant Attorneys General, Sutherland, James A. Orr, Jennifer N. Ide, Laura J. Stipanowich, Benjamin C. Morgan*, for appellees.

---

[16] See *Sawnee*, supra at 706-707; OCGA § 50-13-19 (h) (1) & (4) (agency decision may be reversed if decision violates statutory provisions or is affected by error of law); see also *Ga. Bd. of Natural Resources v. Ga. Emission Testing Co.*, 249 Ga. App. 817, 819-820 (2) (548 SE2d 141) (2001) (on appeal of an administrative decision involving question of law, our function is to determine whether the superior court erred in its final ruling).